Gaston, Judge,
after stating the case as above, proceeded as follows : — There is thus directly presented for oür decision the question which was heretofore raised and argued in the case of Oxendine, (Ante 2 vol. 435,) but which it was then deemed neither necessary nor proper to determine, that is to say, whether the act of 1831, ch. 13, (See 1 Rev. *21 Stat. ch. III., sec. 86, 87, 88, 89,) “ to provide for the collection of fines imposed upon free negroes and free persons colour,” be unconstitutional and void. Every case seriously questioning the constitutionality of a statute is entitled to the most deliberate consideration, because it invokes the exercise of the highest and most delicate function which belongs to the judicial department of the government. The case before us not only seriously raises this question — but raises it upon grounds so plausible at least, if not so strong, as to render full examination of them a task of some difficulty. We have therefore felt it our duty to examine the question with diligence and care, and if the conclusion to which we have arrived be not right, the error will not' have resulted from the omission of our best efforts to form a correct judgment.
The act of 1831, directs that when a free negro or free person of colour shall be convicted of an offence against the criminal law and sentenced to pay a fine, if it shall appear to the satisfaction of the Court that he is unable to pay the fine imposed, the Court shall direct the Sheriff of the County' to hire out the free negro or free person of colour so convicted to any person who will pay the fine for his services for the shortest space of time. It further makes it the duty of the Sheriff during the week of the Court, or as soon thereafter as may be convenient, publicly, at the door of the Court-house, to hire out the convict to any person who will pay the fine so imposed for his services for the shortest space of time, and to take from the person so hiring, bond and security in double the amount of the fine so paid, payable in ' the same manner, and with the same conditions for the proper treatment of the free negro or free person of colour during the time for which he is so hired, as are contained in apprentice bonds, except the condition of teaching him to read and write. It declares that such hirer shall have the same authority over, and the same right to require and control the services of such free negro or free person of colour, and shall be liable in all respects to the same obligations and duties as masters now have, and are liable to, in cases of apprentice bonds. It further enacts, that if no person can be found who will pay the fine so imposed for the services of the free negro or free person of colour so fined for a space *22 of time not exceeding five years, it shall be the duty of the Sheriff to hire the free negro or free person of colour to any Person who will pay the highest sum for his services for five years, which sum shall discharge the fine ; and it shall be the duty of the Sheriff after deducting five per cent, commissions to account for and pay over the money collected by virtue of this act as other fines. Provided that if any free negro or free person of colour hired out under the provisions of this act shall abscond or leave the service of his master before the expiration of his time, he shall be liable and bound to make up such time so elapsed by serving double the time thereof; and provided further that the fine imposed shall in all cases be at least equal to the amount of the costs of such prosecution.
On the part of the defendant it has been objected that the act in question comes in direct conflict with that section in our constitution which protects the person of a debtor after ascertained insolvency from imprisonment for debt, and with those sections in our declaration of rights, which prohibit the imposition of excessive fines and the infliction of cruel or unusual punishments, and the destruction or the deprivation of life, liberty or property of a free-man otherwise than by the law of the land. It was insisted however in argument by the Attorney General that it was unnecessary to enter into the examination of these constitutional prohibitions, for that the defendant can set up no right and claim no benefit from them, because he is not a citizen of North Carolina. The positions, of the Attorney General are, first, that these provisions, being contained in the fundamental law by which the people of North Carolina, theretofore a colony and dependency of Great Britain, rising in revolt against the oppressions of the mother country, constituted and declared themselves a sovereign and independent state ; all the securities provided in that fundamental law either for persons or for property, and all the inhibitions against wrong, were designed exclusively for the benefit of those who were constituent members of that State, and of such as by inheritance or subsequent incorporation into that political body should thereafter become members thereof: and secondly, that persons of colour, whether born free or emancipated from slavery, *23 Were not originally members of that political body and never since have been incorporated into it. We do not yield our assent to either of these positions in the extent in which they have been asserted.
Theprima-th^con-^as tlie1 pie by pe° was ot-1* deined, and the political pow-£,rant,ed thereby* must be reserved or tharpeople fy,1 orlo8" whom it ^,sed.°m
No doubt, the- primary purpose of the constitution was the well being of the people, by whom it was ordained, and the political powers reserved or granted thereby must be stood to be reserved or granted to that people collectively, or to the individuals of whom it was composed. But as justice is the great object, highest duty and best interest of every community, that people wisely deemed it essential to the well-being of themselves as a-community so to conse- ... . . . crate by their most solemn .sanctions certain great principles of right as to cause them to enter into the very elements their association, in order that their violation should never be . . permitted to any who might be entrusted under the constitution with the powers of the State. For instance, the section of the constitution is express that “ all prisoners shall be bailable by sufficient sureties, unless for capital offences when the proof is evident or presumption great.” Can it be contended that this universal command may be disregarded unless the prisoner be a citizen? Take the 9th section of the declaration of rights, “ all men have a natural and inalienable right to worship. Almighty God according to the dictates of their own consciences.” Is this declaration to be understood as of a right belonging solely to the citizens of North Carolina ? Take the 7th, 8th, and 9th sections of the same instrument, by which it is declared that every man accused of a crime has a- right to be informed of the accusation against him, to confront his accusers and witnesses, and no man shall be compelled to give evidence-against himself — that no free-m'an shall be put to answer any criminal charge, but byr indictment, presentment or impeachment— nor convicted of a crime but by the unanimous verdict of a jury of good and lawful men in open Court. Is it believed that these great principles in the administration of criminal justice may be set at 'nought if the accused is not a citizen ? By the 40th section of the constitution, it is provided that, every foreigner who comes to settle in this state, having first taken an oath of allegiance to the same, may purchase, or by *24 other just means acquire, hold and transfer land or other real estate, and after one year’s residence shall be deemed a free cltlzen. B" su°b a person under the sanction of this clause, purchase land here, will it be doubted whether the land thus acquired is secured to him by that constitution, so that it cannot be taken away even before he becomes a free citizen, otherwise than by the law of the land ?• We understand the section in the constitution, whatever may be its meaning, prohibiting the imprisonment of debtors as applying to debtors whether citizens or foreigners dwelling amongst us — ■ and all the sections which interdict outrages upon the person, liberty, or property of a free-man, as securing to that extent for all amongst us who are recognized as persons entitled to liberty, and permitted the enjoyment of property. They are so many safeguards against the violation of civil rights and operate for the advantage of all by whom these rights, may be lawfully possessed.
Butthat the eonsti-which’prohibits the meinof1 appííesfto whether citizens or dweUhng3 those sec-which interdict outrages upon the person, a freeman, that extent nlongstus recognised as persons liberty? or the'enjoyment of They me safeguards against the civil rights, ratefoMhe advantage of all by whom helawfully possessed.
*s not necessaryto examine very particularly the argmment upon the second position, which in its course assumed on both sides very much the character of a political discus-1 g;on_ According to the laws of this State, all human beings ° ... ® within it who are not slaves, fall within one of two classes* distinctions may have existed in the Roman law fogueen citizens and free inhabitants, they are unknown to our institutions. Before our Revolution all free persons born within the dominions of the king of Great Britain, whatever '•bel1' colour or complexion, were native born British subjects —those born out of his allegiance were aliens. Slavery did not exist in England, but it did exist in the British colonies, Slaves were not in legal parlance persons, but property, The moment the incapacity — or disqualification of slavery was removed — they became persons, and were then either British subjects or not British subjects, accordingly as they were or Were not born within the allegiance of the British king. Upon the Revolution, no other change took place in the law of North Carolina, than was consequent upon the transition from a colony dependent on* an European king to . t . . a fi’ee and sovereign state. alavés remained slaves, British subjects in North Carolina became North Carolina, free_men. Foreigners until made members of the State *25 continued aliens. Slaves manumitted here become men — and therefore if born within North Carolina are citizens of North Carolina — and all free persons born within , , . . „ . „ r the State are born citizens or the State.
^cf¿fanfa of this human^e-¡"faiHvíth-in one of I'^to^vitT nd
poreign. ers "nless made members |ftate con-aI‘ Slaves . and if bom North ^“cltzens of North —and'all gr0e®sp^.n within the Stfito ctr© born citi-the
K zation is aUfUtlT' diisct'bzliit'ics of alien-age. E-üon isfthe of ThTfatter ^fiyup. on the in-terna! vog-ulations of longs to the gov-the'iJnited itwouíd be a dangerOUS mistake to them.Und
*25 A few only of the principal objections which have been urged against this view of what we consider the legal doctrine, will be noticed. It has been said that by the constitution of the United States the power of naturalization has been conferred exclusively upon Congress — and therefore it cannot be competent for any state by its municipal regulations to make a citizen. But what is naturalization ? It is the removal of the disabilities of alienage. Emancipation is the removal of the incapacity of slavery. The latter ■* ^ ** depends wholly upon the internal regulations of the State— the former belongs to the government of the United States. It would be a dangerous mistake to confound them.
It has been said that before our Revolution, free persons of colour did not exercise the right of voting for members the colonial legislature. How this may have been, it would be difficult at this time to ascertain. It is certain however that very few, if any, could have claimed the right of suffrage, for a reason of a very different character than the one supposed. The principle of freehold suffrage seems to have been brought over from England with the first colonists, and to have been preserved almost invariably in the' colony ever afterwards.. In the act of 1743, ch. 1, (Swann’s Revisal, 171,) it will be seen that a freehold of fifty acres was necessary to entitle the inhabitant of a county to vote, and by the act of 2d Sept. of 1746, ch. 1, Ibid. 223, the free holders only of the respective towns of Edenton, Bath, Newbern and Wilmington were declared entitled to yote for The VG1*V" Coil- * our constitution, was chosen by That constitution extended the elective fran-members of the Colonial Legislature, gress which framed our constitution, was freeholders. chise to every freeman who had arrived at the age of 21, and paid a public tax ; and it is a matter of universal riety that under it, free persons without regard to colour, claimed and exercised the franchise until it was taken from free men of colour a few years since by our amended consti- . t-. , , . / , . tution. But surely the possession oi political power is not *26 essential to constitute a citizen. If it be, then women, minors, and persons who have not paid public taxes are not citizens — and free white men who have paid public taxes arrived at full age, but have not a freehold of fifty acres, as they may vote for one branch and cannot vote the other branch of our legislature, would be in an intermediate state, a sort of hybrids between citizens and not-citizens. The term “ citizen ” as understood in our law, is Precisely analogous to the term subject in the common law, the' change of phrase has entirely resulted from the _ . ° nm . . , change of government. Jthe sovereignty has been transferred from one man to the collective body of the people— he who before was a “ subject of the king ” is now “ a citizen of the State.” . ‘Considering therefore the defendant having a right to the protection of the clauses in the con-stjtution and declaration of rights on which he relies, we proceed to the examination of the alleged repugnancy between these and the act of 1831. The 39th section of the constitution is in these words: “ The person of a debtor, where there is not a strong presumption of fraud, shall not continued in prison after delivering up bona fide all his esíate! real and personal for the use of his creditors in such manner as shall be hereafter regulated by law.” The argument of the defendant’s counsel is, that this declaration of will of the people is found where details are not to be expected] that by it there is thus embodied into the constitution a great principle which pronounces imprisonment of body of an honest but unfortunate insolvent debtor, unjust oppressive ; that the restraint of his person whether in or under the constraint ot a master or keeper is substan-imprisonment; that a fine to the State, though ™posed because of crime, is a debt; and that an act of the General Assembly commanding imprisonment of such insol-to enforce satisfaction of this debt is therefore in direct confbct with this paramount law of the land. The argument relieved from one great difficulty with which it would otherwise have had to contend, by the adjudication of this Court Benton v. Dickens, 3 Murph. 103, and Jordan v. James, 3 Hawks, 110. constitution would seem mandatory on the legislature, and to In its terms the injunction of the *27 be carried into execution only by the legislature. The continuance in prison was forbidden after, the surrender bona of the debtor’s estate for the use of his creditors in such manner as should be thereafter regulated by law'; and until such regulations should be made by law, it was not in the power of any Court to ascertain whether the required surrender had been or had not been made. But in the cases referred to, it was decided, that as the General Assembly in the year 1778, Rev. ch. 133, had declared all the acts of the colonial legislature which were in force before the Revolution to be yet in force, so far as they were not inconsistent with the freedom and independence of the State, and with the new form of government; and as by an act of the colonial legislature of 1773, it had been provided that a prisoner for debt, on surrendering his property for the use of his creditors in the manner therein directed, or without any surrender where he was not worth forty shillings sterling, and upon taking an oath of insolvency, should be set at liberty, and be forever discharged both as to his person and property as against the creditor at whose instance, and for the debt upon which he was imprisoned — the act of 1778, was a substantial re-enactment of the regulations for ascertaining a bona fide insolvency, and therefore under the constitution, the insolvent complying with.those regulations was protected from imprisonment’ for any antecedent debt to any creditor. Submitting, as it is our duty to submit, to the authority of these adjudications of our predecessors, we hold therefore that the 39th section of the constitution does prohibit the imprisonment of an insolvent debtor, after that insolvency has been ascertained to be bona fide m any manner directed by law either before or since the adoption of the constitution, And we also agree that the principle thus sanctioned by the constitution is not to be honored in form only, and disregarded in substance, by a literal adherence to the words “ continued in prison.” A delivery over of his person from the public prison to a master or private keeper is as much , ,. . . , „ , iorbidden as his continuance m the prison. But the same rule of construction which commands that effect should be given to the constitutional will of the people, to its . , * 1 extent, without regard to verbal subtleties, equally forbids *28 that we should interpolate into the constitution what the people did not will, by an artificial and technichal stretching their language beyond its ordinary, popular and obvious mean'nS‘ Ultra cirtraque nequit, consistere rectum. A fine imposed for an offence against the criminal law of the country, is a punishment — an evil or inconvenience .in the form 0f a pecuniary mulct, denounced and inflicted, by human laws, in consequence of disobedience or misbehaviour, not by way of atonement or compensation, but as a precaution against future offences of the same kind — to correct the . offender and as a terror to evil-doers. After it has been judicially imposed the same means may be used to enforce *ts collection, which by law the sovereign may employ to collect his debt — because by the imposition of the fine, the right of the sovereign to that amount of money from him who has been sentenced to pay it, has been conclusively ascertained of record. For this purpose, it may be regarded as a debt due die sovereign. But it is incontestible, we dunk, that the section of the constitution which we are now considering did not embrace — and cannot without violence to many other provisions in it be held to embrace — fines imPosedon conviction of crimes. It speaks of a debtor, honestly surrendering all his effects for the use of his creditors. Neither of these terms, “ debtor or creditor,” is appropriate to descr¡be the relation in which the convicted offender and the offended State stand towards each other. Again, the constitution itself discriminates between debts and fines. th.is section it provides against unnecessary and wanton jmprisonment for the collection of debts — but in regard to fines its language is “ excessive ball shall not be required, nor excess{ve jines imposed, nor cruel nor unusual punishments inflicted.” Declaration of Rights, sec. 10. Here we find a fine classed, where it ought to be, among the means in the administration of criminal justice, and in imnie-díate connection with other punishments imposed or inflicted, in the course of that administration. Moreover, the 19th section of the constitution confers on the Governor the power of granting pardons, but no part of the constitution gives him any power over the public property, whether consisting of debts due to the State or of any other kind, except the naked *29 authority “ to draw for and apply such sums of money as shall be voted by the General Assembly for the contingencies of government,” and for these he is “ to be accountable.” Now if a fine of this character be a debt — a mere debt— creating the simple relation of debtor and creditor, between the individual who has been sentenced to pay and the State who is to receive it — certainly the Governor has no power to remit or release it. Yet from the institution of our government down to this day, it has been the uniform, constant, and with one exception unquestioned usage of the Governor to grant a pardon remitting fines thus imposed — and on the only occasion when the question of his right so to do was raised, this Court held that it did not admit of discussion. State v. Twitty, 4 Hawks,1 93. Nay, up to the last session of our legislature it has'been considered as undoubted law— (and because the law was so deemed, the-legislature at that session passed the act to which we shall hereafter have occasion to refer) — that there was no power under the law except the pardoning power of the executive which could relieve an imprisoned offender from his fine. It has been the understanding of every branch of the government, legislative, executive and judicial — of the whole community ever since the constitution was ordained, that a fine might be remitted by pardon, because it was a punishment, and that a prisoner could not be discharged from a fine under the insolvent acts, because in the sense of the constitution, it was not a debt. It is too late now, if it ever could have been permitted, to entertain a doubt upon the subject. Constitutions are not themes proposed for ingenious speculation; but fundamental laws ordained for practical purposes. Their meaning once ascertained by judicial interpretation and contented acquies-.i i . " ' • -i , . , cence, they are laws m that meaning until the power that formed, shall think proper to change them. The argument therefore which we have been considering fails in this, that the fine imposed by the sentence below is not a debt within the meaning of the 39th section of the constitution. But the argument presents another view in relation to the character ' * of the fine which is proper to be considered. The last proviso in the act, makes it the duty of the Court before whom *30 the coriviction of a free negro or a free person of color shall take place, on ascertaining his insolvency, to impose in every case without regard to the character of the offence, a fine at least equal to the costs of prosecution. Now by antecedent acts the several counties in the state are charged in cases of insolvent criminals with the costs of prosecution, and all fines levied on convicted offenders, belong to the counties respectively in which the convictions are had. In pursuance of these acts, the statute before us makes it the duty of the Sheriff to account for and pay over the money collected under it, after a deduction of his commissions, as other fines. ^ *s therefore manifest, say the counsel for the defendant, that the very purpose of the enactments in this statute is to reimburse the county the expenses of prosecution, and that ple fjne so directed to be imposed, and all the machinery for collecting and discharging the fine, are in effect so many provisions for collecting costs, and whatever may be thought of a fine really imposed for punishment, yet costs consequent upon conviction do constitute a debt. There are difficulties in interpreting the act with which of course we should not hesitate to grapple were it necessary. For instance, it would seem that the fine, the minimum of which is fixed, is required to be imposed before the insolvency is as-' certained. This may however ,be a mere inaccuracy of language or arrangement. But however this may be, a very strong, if not insuperable difficulty is felt by a portion of the Court in asserting for the judicial branch of the government, a right to understand an act of the legislature as professing one thing and meaning another, or to suppose the legislature designed to do indirectly what was directly interdicted to them. Another portion of the Court feels no such embarrassment, but thinks that the purpose of the act to sequre to the counties the costs of prosecution is manifest, and that there is no indelicacy in thus interpreting its enactments. It feels itself bound indeed to believe that the legislature did not intend to violate the constitution, and that they had no doubt of their right under the constitution so to relieve the counties from the inconvenience of paying the costs of prosecuting insolvent free negroes. It conceives therefore that the legislature being satisfied of the rightfulness of their ob *31 ject, might for very sufficient reasons of expediency have preferred to accomplish this object rather by ordering the costs to be included in the fine, than by the ungracious mode of excluding the persons convicted from the benefit of the laws which permitted insolvency to exonerate from costs. But in the judgment of the Court, it is unnecessary to determine whether this be or be not the true construction of-the „ . act, for the costs of a convicted offender are not a debt. The general rule of the common law was' that the sovereign neither pays nor recovers costs. It is not easy now to when this rule was first departed from in North Carolina, by making the payment of costs a part of the sentence of the Court. The change was antecedent to the Revolution, for in an act of 1762 for laying a tax on the several counties of the District of Halifax Superior Court, to repair the public prison thereof and for other purposes, (Swan’s Revisal 299,) the new practice seems to be recognised. We find it there enacted “ that the charges of committing and keeping a criminal shall, if such criminal have not sufficient estate to satisfy the same, be paid by the public.” Since the Revolution it has certainly been the usage in every case of conviction when a fine was imposed, to add thereto “ and pay also the costs of piosecution.” The existence of this usage was recognised in an act of 1778 ch. 4. (Iredell’s Revisal 363.)
The os session of powers notessen-stitutea itbe^then1 minors’ and per-have not taxesPareÍ0 not citizens.
Free ne- . groes and free persons of colour are citizens! to the protec-39th sec-const>itu-he the'ioth'1 section of rights.
The cases of Burton 3 Murph?5’ Jordan v James, 3 approved,
Section íf thf.oonsti" der the’op-the act of prohibits onment of venTdebt- or>aftor that msol-vency has tafnecUo1" fide in any manner d'rected b law, either since the adoption of union.
A fine imposed for an offence against the law'ofthe a°pun*s¿-S ment.
And as, af-beenjudi-posee! ¡th" same’ maybe force itg311" collection, law°the'y state may employ to collect its mayt’for pose1 here-gaided^as to the State.
not a debt within the theconstf tution.
Constitutions are ?or mgen-lation, but taf^aws”" ordained for practical purpo-meaning* tainedS°by tion and acquiescence, they that mean-the Upower shall”" think prop-change them.
The costs of a con-render are a debt-
Up to that time, the state’s witnesses were not entitled to demand fees for their attendance. The act recites this as an injustice to these witnesses, and for the cure thereof directs that thenceforth they shall be allowed the same pay for their daily attendance as is allowed to witnesses attending in civil suits, and such fees for attendance shall be paid by the defendant upon conviction; and if the state shall fail upon the prosecution of any offence of an inferior nature, the Court may at their discretion order the costs to be paid by the prosecutor in case such prosecution shall appear to have been frivolous or malicious; and in case the defendant shall not be able to pay costs, or the Court shall not think fit to order the prosecutor to pay the same, that then and in that case, the Clerk shall grant a certificate to such witnesses in manner as certificates are directed to be granted to witnesses in civil causes; and such certificates may be received by the
The sen-Mimced™'as convicted8 criminal shall pay of i>rosecution is as part of8his Sentías m nowine, never been ^®1 e0uj¿at therefrom ^ 0ta|jjn0f insolvency, except by virtue of statutory enactments au-thorising or supposed to au-thorise - such a discharge.
*32 Sheriffs in payment of public duties. The provision in this statute for the casé in which the defendant shall not be able to Pay costs> was construed, or rather misconstrued into a legislative permission for a defendant sentenced to pay a fine and the costs of prosecution, to discharge himself from the costs by taking the oath of insolvency. The act of 1787, ch. 11,(Iredell's Rev. 613,) recites that many persons convicted' on indictments take the benefit of the insolvent act, either neglecting or refusing-to pay fees of office, and Sheriffs’ and Gaoler’s fees, and for remedy thereof, enacts that every person who shall be found guilty of any charge exhibited against him by indictment or presentment, and shall be unwilling or unable to pay the office and Gaoler’s fees, that are or may be consequent thereon, shall be hired out by the Sheriff of the county where such person is convicted, for such time as any person will take him, td . serve for the said fees and charges, the said Sheriff first advertising the time and place of hiring at least ten days previous theretoo. This act, which was sometimes, though seldom enforced, had the effect to put an end to the practice of discharging criminals from costs by taking the oath of insolvency. It has never been directly repealed, but it was regarded as harsh and offensive by a large portion of the community; and upon provisions being made by subsequent statutes for the payment of costs incurred by the state in prosecutions where the defendant was convicted but unable to pay, containing, it was thought, clear indication that the defendant might be wholly discharged from the costs of insolvent, the act of 1787 was decided by the Courts to have been impliedly repealed thereby. From this review of our usages, legislative acts, and judicial interpretation of them, it follows that the sentence pronounced against a convicted criminal that he shall pay the costs of prosecution is as much a part of his punishment the fine imposed ceo nomine, and .that it was never held that he could discharge himself therefrom by taking the oath of insolvency, except by virtue of statutory enactments authorising or supposed to authorise such a discharge. The right of the legislature to prescribe the punishment of crimes belongs to them by virtue of the general grant of legisla-five powers. It is a power to uphold social order by com- . *33 petent sanctions. Unless they be restricted, and so far only as they are restricted by constitutional prohibitions, it is a power in the legislature to accomplish the end by such means as in their discretion they shall judge best fitted to effect it. If they choose to annex as a penalty to guilt, that the offender shall in every case be mulcted, whatever other punishment may be inflicted, with the costs of prosecution, there is no authority in the land to gainsay it. If they think proper to provide that either the whole pecuniary penalty, or any part of it, fine and costs, or costs only, shall not be exacted when the prisoner is ascertained to be unable to pay, it is an act of grace which the judiciary will cheerfully carry into execution. But if they do not so provide, the re. lief of the unfortunate offender must then be sought not from the judiciary, but from the Governor, who can remit all punishment or any portion of it.
The right of the leg-prescribe t 0f crimes be-them by ^“gener-f1 grant of legislative powers. It “upheld or" competent unless0”3 *|trieted and so for they are £“4"onst'-tñtional tkms, it is compHsh0 suchnd by ^thir88 discretion judge besf feet it l°ef"
*33 But there is another answer to this argument which is alike decisive. The argument assumes that the 39th section of the constitution restricts the power of the State in the collection of debts due to the State.. We are satisfied that the assumption is unfounded, and that the section has no application to or bearing upon debts of this character. We think that this conclusion follows from the established rules for the interpretation of laws; from the nature of the provisions contained in the section; and from the uniform exposition which has been given to it. The rights and interests of the sovereign, whether that sovereign be a king or a people, are not tobe restrained or diminished by general words not * 0 clearly inferable to them. Upon this principle it was a well known rule of the common law, that the king was not bound by any act of parliament wherein he was not named, unless it was an act in assertion of public rights or in suppression of public wrongs, and not interfering with his acknowledged interest. It is a principle founded in good sense. Public rights exist for the support and well being of the whole community. Every individual of that community has an interest in their preservation and maintenance. They are of too great importance and of too general concern to be curtailed by construction and implication, and it is a natural presumption that when an interference with them *34 is designed, the purpose will be unequivocally expressed. The language of the section is not applicable to public dues. ^ sPea^s "°f a bona fide surrender of all the estate real and personal of the debtor “for the use of his creditors.” Can it be believed that it wds intended thereby impliedly to abolish the principle, embodied in the institutions of our fore-^a^lers ancl supposed to be kept inviolate to this day, that the debt to the sovereign shall be preferred to all other debts ? Was a surrender “ for the use of the creditors of the debtor” whiob would violate this order of preference to the injury of the State, to draw down the special favor of the State upon the debtor ? Was public delinquency to be excused, because tbe property taken from the State was applied to the use of the defaulter’s' creditors ? The exposition of this section which has always prevailed is, we are convinced, the one- The object, and sole object of the provision, was to protect unfortunate debtors, who had been unable to comply with their private engagements, from the malignity, resentment and cruelty of their offended creditors; to take l"1’0111 ^lese fbe power which the common law gave of incarcerating the person of their debtor for life, although he had honestly surrendered to them all the means he had of dis-uluauging their claims, and although this imprisonment deprived him of the ability to procure other means to pay what remained due. . Upwards of thirty years ago, it was decided in the case of the State against Exum in Hills-borough Superior Court, (then the Exchequer Court of the State,) where the defendant had been surrendered by his bail and committed in execution upon a judgment against him as a District Treasurer, that he could not be discharged ' ' ® from imprisonment as an insolvent; and it is confidently believed that there never has been a case in which a public debtor has been allowed the benefit of this supposed constitutional right.
"section^>f tution "has no applica-bearing °r due"o State.
ité object object,°was unfoPrtueCt nate debt-had'been compfy t0 with their gage-" e" from the malignity, ment and their of- °f fended creditors.
The next ground on which .it is urged that the act is unconstitutional is, for that it is repugnant to'the 10th section of the bill of rights, which declares “ that excessive bail shall not be required, nor excessive fines imposed, nor cruel nor unusual punishments inflicted.” ’ The act, it is argued, violates the principle of that part of this section, which forbids *35 the imposition of excessive fines, because it compels the Court whatever may be the nature of the offence — however trivial — to impose a fine at least equal in amount to the costs of prosecution. And what it is asked are the characteristics of the offence thus peculiarly visited by legislative severity 1 They are two — that the offender is a free person of color— and that he is unable to pay a fine. His color and his poverty are the aggravating circumstances of his crime. Whether a fine be reasonable or excessive', ought to depend on the nature of the offence, and the ability of the offender. But the nature of the offence is left out of consideration, and the inability of the offender to pay, is made the cause for raising the minimum of the fine.
The lan-?he lotlf section^ of is ¿¿recinto the juchcia-for the regulation conduit in ih,e admm-justice.
n0 doubt ^ manity andenjoin-ought to^ the rever-®g“latgnd duct of'oZZ ' obedience6 to the con-But when tureleSact-it ingvpoa^ specifying be6 fmpos° the rea 6S sonable or them,8 °are ly que?1'1" tions of it is not ’ how this66 discretion can be su-. pervised dmate°"°r" branch of .the government. in^no case can it be, unless (he. act com-ivmí»in grant6 -rio-lation of^ tion as to disregard tutiomd^" restraints,
*35 Whatever force there may be in this reasoning, addressed to a body intrusted with a discretion over the subject, we are compelled to regard it solely and exclusively so far as it tends to show that the act is one which we can pronounce to be forbidden by the constitution. Now there are great, if not insuperable difficulties in a Court undertaking to pronounce any fine excessive which the legislature has affixed to an offence. It must be admitted that the language of this section of the bill of rights is addressed directly to the judiciary for the regulation of their conduct in the administration of justice. It is the Courts that require bail — impose fines — and inflict punishments — and they are commanded not to require excessive bail — not to impose excessive fines — not to inflict cruel or unusual punishments — and it would seem to follow that this command is addressed to them only ... ^ m those cases where they have a discretion over the amount of bail, the quantum of the fine, and the nature of the punishment.7 No doubt the principles of humanity sanctioned and enjoined m this section ought to command the reverence and regulate the conduct of all who owe obedience to the constitution. But when the legislature acting upon their oaths declare the amount of bail to be required, or specify the fines to be imposed, or prescribe the punishments to be inflicted in case of crime ; as the reasonableness or excess, the justice or cruelty of these are necessarily questions of discretion, it is not easy to see how this discretion can be supervised by a co-ordinate branch of the government, *36 "Without attempting a definitive solution of this very perplex-iug question, it may at least be safely concluded that unless ^le act complained of (which itwould be almost indecent to suppose) contain such a flagrant violation of all discretion as to show a disregard of constitutional restraints it cannot be Pron°uuced by the judiciary void because of repugnancy to the constitution.
i With respect to the act in question, we cannot say that does contain such a violation. If, which seems to have been believed below, for the sentence is to pay a fine only, and which, as it is a penal Statute, ought to be taken to be true construction, the Court is required to inflict no greater or ot^er pecuniary penalty than the fine, then the offender’s pecuniary punishment is not necessarily greater than that which in effect is denounced and imposed on all other offerers upon conviction ; and the' objection as to excess will then be, that he cannot have. the benefit of regarding the fine to this extent as a sentence to pay costs, and of obtaining a discharge from that part of it by reason of insolvenCy. The -distinct effect of the objection thus considered will . _ , be hereafter examined.
After what has been said on the subject of excessive fines, it cannot be necessary to say much on the subject of . , ¿ • ... cruel and unusual punishments. Our power to question the validity of a legislative act,, because it denounces a punishment which we think too severe or not of an usual kind — if . ... . it can exist at all — certainly exists only m cases so enormous there can be no doubt but that all discretion has been thrown aside. This act, whatever objections it may be exposed to because of its liability to abuse, is not subject to imputations of this kind. It contemplates, where the offender has not money nor property whereby he may be visited for °®3nce’ that he shall not therefore escape all punishment, but shall be compelled to work out his fine. There is no penitentiary or- public work-house here, and therefore he must be put out to work under the charge of some one. Whether it was expedient to make that selection of that individual by an auction, and whether adequate precautions have been devised by the act to secure a proper keeper, and take from him adequate security for the humane discharge *37 of his duties and exercise of his powers, are all inquiries exclusively belonging to legislative' discretion. But the act does devise precautions designed to effect these purposes ; makes the relation thereby created one well known to the law, that of master and apprentice, and subjects the master to legal visitation for inhumanity or improper treatment of such apprentice.
whatever ™oygl¿eof a penal whichfa jjfente"act' makes dis-between “he com-°f munity and another capri-“ndliy waY ,of fa_ VOFltlSlTl it cannot intile powers to "he'kg-^ats”p.for pression ishment of th‘eyeSmay rightfully tion^pun- *°^® con-tempta-crime, and sufibi^ of those^ who to offend, duce°inPef-^asoíable and practity1 instilé ad ministration of justice, the^object of all free mentsto pfish™"
*37 But it was insisted that the act in thus discriminating between the punishment of free persons of color and other free persons is arbitrary, repugnant to the principles of free government, at variance with the spirit of the 3d section of the bill of rights denouncing exclusive privileges, and not of the character properly embraced within the term “ law of the land.” We do not admit the validity of this objection. Whatever might be thought of a penal Statute which in its enactments makes distinctions between one part of the community and another capriciously and by way of favoritism, it cannot be denied that in the exercise of the great powers confided to the legislature for the suppression and punishment of crime, they may rightfully so apportion punishments according to the condition, temptations to crime, and ability to suffer, of those who are likely to offend, as to produce in effect that reasonable and practical equality in the adminis- . „ . . , . . . . , - „ „ tration or justice which it is the object of all tree governments to accomplish. What would be cruelty if inflicted on a woman or a child, may be moderate punishment to a v x man. What might .not be felt by a man of fortune, would be oppression to a poor man. What would be a slight convenience to a free negro, might fall upon a white man as intolerable degradation. The legislature must have a discretion over this subject, and that once admitted, this objection must fail for the reasons already assigned in examining the objections as to the exercise of the powers admitted to be discretionary.
One more objection remains to be considered. The constitution gives to the Governor, the power of granting pardons, except where the prosecution shall be carried on by the General Assembly or the Jaw shall otherwise direct, and in this case he may in the recess grant a reprieve until the next sitting of the General Assembly. Now this act *38 directs the Sheriff to execute the judgment of the Court during the week of its session or as soon thereafter as may convenient, and thereby enables the Sheriff to deprive the person convicted of an opportunity to apply to the Governor for a pardon or reprieve. The answer to this objec-ti°n is,, that the execution of every sentence of a Court, is under the control of the Court, and that the Court is bound by obligations too sacred to be disregarded, to allow time to ma^e application for a pardon jn every case where time is ^onafido desired for that purpose. Whether the Governor’s pardon could or would' not come too late after the offender was hired out and the fine paid, is a question not necessary to be now decided. If the remaining in service be a part . , . , . „ ° , . . , of the pumsnment, certainly the Governor could remit what remained unexecuted of it. If the fine be the punishment anc[ the hiring be but the mode of procuring fine, the Governor’s power-over the subject would probably cease with the payment of the fine.
The execu-tionof ev-trace6 of a under’ the and the ’ bound 1 by obligations too sacred to be allow'time to make application for a par-ery case^ desired for pose. PUr"
Apppeals in criminal nufthe”" rendered8 wh°th’and the sen-teneeg bg approved p^vedf" j^etyt®rbe affirmed « [h^Su-1*”1 bu{ the deci-court is to j?® ¡^tlfied Court be-instruc-to jud|ment tenceeU agreeably tp and the
*38 Upon full consideration of all the objections urged by the prisoner’s counsel, we do not find such clear repugnancy between the constitution and the act of-1831, as to warrant ras in declaring that act unconstitutional and void, and we therefore of opinion that there was no error in rendering judgment against the defendant'agreeably to the provisions of that act.
Appeals in criminal causes annul the sentences rendered ** and whether the sentences be approved or disapproved, they are not to be affirmed or revérsed here. The jaw <qirects that the decision of this Court shall be certified . . to the Court below with instructions <o proceed to judgment and sentence thereon agreeably to that decision and ^aws °f ^le This imposes upon us the necessity of adverting to a law which has been passed since the appeal, and since the argument, and which has an important effect on sentence to be rendered. It is enacted by a law of the,last session that if any person shall be convicted in any Court of record in this State of any crime or misdemeanor and shall be in execution for the fine and costs of prosecu-^011’ and shall have remained in prison for the space of twenty days, it shall be lawful for the person so in execution *39 to be discharged from imprisonment under the same rules and regulations as are prescribed for the discharge of debtors in execution under the first and fourth sections of . the fifty - eighth chapter of the Revised Statutes, entitled “ Insolvent Debtors,” provided that the act shall not be so construed as to release any person from imprisonment who shall be in prison for any definite length of time under sentence of any court, This act does not repeal the act of 1831, but as the last expression of legislative will, it necessarily abrogates so much of that act as stands in the way of its enactments. The last act is one of mercy and grace, and in favour of human liberty, and is entitled toa favourable interpretation. But independently of this consideration, it embraces in express terms all persons convicted of offences of whatever kind, and imprisoned for the payment of fines imposed by reason of conviction, and therefore cannot intend any such person to be excluded from the benefit of its provisions. We hold therefore that the defendant may discharge himself of the fine to be imposed under the act of 1831, by remaining in prison twenty days, and complying with the provisions referred to in the chapter of the Revised Statutes. It will be necessary therefore, to modify the sentence as after infliction of the fine to direct that the defendant be imprisoned until the said fine be paid or he be discharged therefrom by due course of law, and that if the prisoner shall not within thirty days (or whatever period the Court may think reasonable) be discharged by taking the oath of insolvency as authorized by law, then that the Sheriff be ordered to hire him out under the directions of the act of 1831.
This opinion is to be certified to the Superior Court of Sampson with instructions to proceed to sentence accordingly.
As the defendant has not shown any error in the judgment below, he must pay the costs of the appeal.